BENTON, J.
The father of three daughters, S.B. contends that the Department of Children and Families (DCF) failed to adduce competent and substantial evidence, which a reasonable fact finder could find clear and convincing proof, that his continued relationship with his children would be harmful to them, within the meaning of section 39.806(l)(d)3., Fla. Stat. (2013). DCF pleaded no other ground for termination in its petition for termination of parental rights (TPR). We agree that DCF failed to meet its burden, and reverse with directions to dismiss the petition.
Prior to his incarceration, S.B. worked as a plumber. He supported his three daughters and their mother, their half-brother (to whom he had no biological connection), and his own mother, the children’s grandmother. Dr. Bloomfield testified for DCF that S.B. was the main provider for his family, and the girls remember his working “long hours.” DCF did not allege appellant was ever violent, or that he endangered the children in any way. DCF did not allege that he neglected his children, abandoned them, or ever failed to provide shelter or food for them while he lived with them. DCF presented no evidence of any failure to provide for the children’s developmental, cognitive, psychological, or physical needs, until he was imprisoned.
Convicted of driving under the influence of alcohol a fourth time, S.B. began his prison sentence in February of 2012. Three months later, his daughters (now three, six, and seven) were taken from their mother (whose parental rights were eventually terminated by default for her failure to appear at a hearing in these proceedings). Since DCF removed the children, they (and their eight-year-old half-brother) have been placed in separate foster homes, and, during the sixteen months they spent in foster care before the trial, had been moved several times.
On August 14, 2013, DCF petitioned for involuntary termination of parental rights pursuant to section 39.806(l)(d)3., alleging that a continued parental relationship with the father would be harmful to the children because his “extensive criminal history resulting in his incarceration ... has directly impacted the parent-child relationship with each of his children” and because he has failed to maintain a meaningful relationship with the children while incarcerated. The “extensive criminal history” consists entirely of driving offenses. S.B. was convicted of three previous DUIs, one in 2000, one in 2003, and one in 2004. Since the birth of his first child in 2006, however, he had not been convicted of driving under the influence until 2012, shortly after his mother died.
DCF alleges the children will suffer harm, unless their father’s parental rights are terminated, in that they will languish in the foster care system until their father’s release from prison, and thus be “denied permanency.” According to Dr. Bloomfield, the psychologist who testified for DCF, the two older children are in their formative years and ought to be developing bonds and “attaching out to the community, with teachers and the like, and developing a sense of who they are,” and it is important that they have as few disruptions as possible in the next few years. Both Dr. Bloomfield and the family service counselor testified that, if parental rights were terminated, the children were young and resilient enough to form new bonds *1245 with parental substitutes.[1] Dr. Bloomfield also testified that the children could form new bonds while maintaining their bonds with their father.
DCF presented evidence of the father’s relationship with his children, through a family counselor and Dr. Bloomfield, an expert who had never met S.B. or observed him interacting with his children. The evidence showed that he currently has a real relationship with the children and has been at pains to maintain it (although the youngest child has no memories of him because she was only one year old when he was sent to prison). While incarcerated, S.B. attended substance abuse and parenting classes and expects to have approximately ten certificates when he is released. According to DCF’s own evidence, S.B. had written his children fifty letters in a sixteen-month-period, not including birthday and holiday cards.
Dr. Bloomfield, the psychologist, testified to a “strong bond” between appellant and the oldest child. She reported that the oldest child said “it was better” when she lived with her father and talked about their visits to the park, and how S.B. let her play on his iPad; and added that S.B. was nice to her, and that she still considered her former home with him her “real home.” She said she was sad because she can no longer see her family. As for the second child, Dr. Bloomfield stated the bond between them was ebbing due to her fading memories of her father. But she said that both older girls “talked about how their mother and father took care of them together” and how their grandmother cooked for them. They enjoyed receiving letters and “wonderful birthday cards” from him. Although the children also remember their parents’ yelling at each other, and being spanked by their father, DCF does not contend that they suffered any harm as a result that would justify termination of parental rights.
The sole ground on which DCF sought to terminate S.B.’s parental rights is section 39.806(l)(d)3., Florida Statutes (2013), which provides:
(d) When the parent of a child is incarcerated and either:
3. The court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason, that termination of the parental rights of the incarcerated parent is in the best interest of the child. When determining harm, the court shall consider the following factors:
a. The age of the child.
b. The relationship between the child and the parent.
c. The nature of the parent’s current and past provision for the child’s developmental, cognitive, psychological, and physical needs.
d. The parent’s history of criminal behavior, which may include the frequency of incarceration and the unavailability of the parent to the child due to incarceration.
e. Any other factor the court deems relevant.
As the guardian ad litem explains in her brief, the current version of the statute, applicable in S.B.’s case, was the result of an amendment in 2012. Ch. 2012-178, § 15, at 25-26, Laws of Fla.[2]
DCF had the burden to prove the grounds for terminating S.B.’s parental *1246 rights it alleged in its petition for termination of parental rights by clear and convincing evidence. § 39.809(1), Fla. Stat. (2013). We review the circuit court’s decision to terminate parental rights for competent and substantial evidence which a reasonable finder of fact could deem clear and convincing support for the necessary findings. See N.L. v. Dep’t of Children & Family Servs., 843 So.2d 996, 999 (Fla. 1st DCA 2003).
S.B.’s eldest child was seven at the time of trial. Under the old statute, appellant’s four-year sentence (he is to be released in the summer of 2015), would not have been deemed a substantial portion of his children’s minority. See B.C. v. Fla. Dep’t of Children & Families, 887 So.2d 1046, 1054 (Fla.2004) (holding that a father’s incarceration which equaled 28.6 percent of the child’s remaining minority was not substantial); In re S.H., 992 So.2d 316, 317-18 (Fla. 2d DCA 2008) (holding a father’s remaining six-year incarceration was not a substantial portion of the minority of children who were two, three, and four years old); In re E.I.F., 872 So.2d 924, 928 (Fla. 2d DCA 2004) (holding a father’s eight-year sentence was not a substantial portion of time for a child who was eight months old); In re A.W., 816 So.2d 1261, 1264 (Fla. 2d DCA 2002) (holding that 54 months remaining in the father’s sentence was not a substantial portion of a four-year-old or one-year-old child’s minorities); W.W. v. Dep’t of Children & Families, 811 So.2d 791, 792 (Fla. 4th DCA 2002) (holding that 54 months is not a substantial portion of eighteen years). With S.B. scheduled to be released some fifteen months hence, DCF could not have terminated parental rights under the prior version of section 39.806(l)(d)3.
But DCF argues that the 2012 amendments justify termination of parental rights. “[A] trial court is precluded from terminating parental rights on the statutory ground that continuing the parental relationship with the incarcerated parent would be harmful to the child under section 39.806(l)(d)(3) where no evidence regarding the impact of continuing the parent-child relationship is offered.” In re N.S., 898 So.2d 1194, 1198 (Fla. 2d DCA 2005). Proof regarding factors (a) through (c) does not support termination of parental rights. All the children’s ages should be considered, given the objective of keeping them together. As for factor (d), under the amended statute, as under its predecessor, criminal history alone is not sufficient for termination. See In re E.I.F., 872 So.2d at 926-27 (holding that despite the father’s past history of drug use, suicide threats, and imprisonment for aggravated assault of a law enforcement officer, there was not competent and substantial evidence that a continued relationship between him and his children was harmful because he had had treatment while in prison and professed that he had turned over a new leaf); W.W., 811 So.2d at 793 (“Although appellant has had difficulty living within the law [the father was convicted for arson, burglary, and a lewd and lascivious act with a violation of probation], he did live with the family and provide for the children at times when he was *1247 not incarcerated.”)- The driving offenses S.B. committed are by no means the most egregious crimes parents have committed. Parental rights are a “fundamental liberty interest” that cannot be terminated based on incarceration alone. In re J.B., 923 So.2d 1201, 1205-06 (Fla. 2d DCA 2006).
Finally, factor (e) allows the circuit court to consider “[a]ny other factor the court deems relevant.” § 39.806(l)(d)3.e., Fla. Stat. (2013). The order under review concludes that the children “should not have to wait two to three years for the possibility of achieving permanency” with the father upon his release, “languishing]” in foster care until then. But there was no evidence that the father could not take care of his daughters upon his release from prison, or of any other realistic prospect for permanency.
DCF was unable to place the children together during the sixteen months they had spent in foster care, because, witnesses testified, nobody was willing to take in all four children. When the case was tried, the two older girls were in one foster home and their sister was in another. DCF denied placement with the children’s great-grandmother, a great-uncle, and an uncle in Georgia (all on the father’s side) in part because, while these relatives were willing to take the three girls, they did not want to take on their half-brother, and DCF wished to keep all four children together. The family counselor testified it was very possible that they will continue to move from placement to placement, and no DCF witness testified adoption was a possibility for the children. A1 in all, their father may well be their best chance of “permanency.”
Athough it “is the province of the fact-finder to synthesize the evidence,” and no one factor is determinative, the findings in the present ease merely underscore the lack of competent and substantial evidence to support termination. See J.S. v. Fla. Dep’t of Children & Families, 18 So.3d 1170, 1179 (Fla. 1st DCA 2009). There was no testimony that reuniting these children with their father would be harmful to them. In fact, Dr. Bloomfield, DCF’s own witness, testified that severing S.B.’s parental rights would cause the children “pain and mourning” and that they would need therapy to get through the process. Cf. R.M. v. Dep’t of Children & Families, 847 So.2d 1103, 1104 (Fla. 4th DCA 2003) (parental rights terminated where two separate therapists for two children testified that reunification with the father would be “extremely detrimental to the children’s mental health,” and one therapist said it would “ ‘completely destroy” the child).
Athough Dr. Bloomfield expressed a desire that the children “move forward in their lives with new families,” the family counselor admitted that realistically the children had only temporary foster care to look forward to, with “the idea of permanency some time down the road,” it being “very possible” that they will be shuffled from placement to placement indefinitely if S.B.’s parental rights are terminated. His release may occur as early as July 14, 2015. DCF has failed to prove the only harm it sought to prove — that a continued relationship with the father would jeopardize the children’s possibility of permanency. The girls do have a “permanent” adult in their lives who regularly sends letters and cards that may help them deal with the downside of foster care until they are reunited with their father who, the evidence showed, has retained his plumber’s license.
Reversed.
PADOVANO and ROBERTS, JJ., concur.

. The children will also presumably still be young and resilient enough to renew their bonds with their father in the summer of 2015 when he is to be released from prison.

. "The bill amends current law to give direction to the court to consider certain factors regarding terminating parental rights of an incarcerated parent [to] help avoid children *1246 languishing in foster care when their parent is incarcerated.” CS for CS for HB 803 (2012) Bill Analysis 1 (April 30, 2012). The amendment had the result of shifting the analysis away from solely quantitative, formulaic calculations of what portion of a child's minority a parent’s incarceration would last, see e.g., In re A.W., 816 So.2d 1261, 1264 (Fla. 2d DCA 2002) (concluding "the trial court may consider only the length of time the parent will be incarcerated in determining whether that period constitutes a ‘substantial portion of the period of time’ before the child reaches age eighteen”), to a more qualitative analysis. The Legislature changed the word "substantial” in section 39.806(l)(d)l. to “significant” in describing the time of a parent’s incarceration. Ch. 2012-178, § 15, at 25, Laws of Fla.